TOTENBERG, District Judge,
concurring in part and dissenting in part:
I agree with much of the Majority’s opinion, including its determinations that Plaintiffs-Appellants have Article III standing to sue the Army Corps of Engineers and that the District Court erred in barring this suit on the equitable basis of laches. To that extent, I concur in the Majority opinion. But I respectfully dissent from the Majority’s decision to remand without vacatur based on its determination that “we cannot say that the-Corps’ ultimate conclusion — that NWP 21 will have minimal effects — was unlawful.” I think the significance of the Corps’ error is plainly discernible from counsel’s argument and the statutory and regulatory requirements governing the issuance of nationwide permits.[1]
The underestimation of the actual impacts to the waters of the United States is central to the issue of whether the Corps’ minimal impacts determination was “arbitrary, capricious ... or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). The Corps’ issuance of NWP 21 based on its admitted failure to “fully take into account the potential impacts of the activities authorized by NWP 21(a) [the grandfather provision in dispute on this appeal] when concluding that the impacts of NWP 21 would be minimal” violated § 404 of the Clean Water Act (“CWA”).[2] See 33 U.S.C. § 1344. Under *1293 § 404 of the CWA, the Army Corps is authorized to issue a general permit only if the regulated activities are “similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.” 33 U.S.C. § 1344(e)(1); accord 40 C.F.R. § 230.7(a). The 404(b) Guidelines require the Corps to predict cumulative effects by evaluating the number of individual discharges of dredged or fill material into waters of the United States expected to be authorized by the general permit until it expires. See 40 C.F.R. § 230.7(b)(3); see also 77 Fed.Reg. 10,206. The minimal impacts analysis “must be completed before any General permit is issued.” 40 C.F.R. 230.7(b). “Under the CWA, the issuance of a nationwide permit hinges on the reviewing agency’s finding that a proposal has only a ‘minimal cumulative adverse effect on the environment.’ ” Ky. Riverkeeper, Inc. v. Rowlette, 714 F.3d 402, 412 (6th Cir.2013) (citing 33 U.S.C. § 1344(e)(1) and 40 C.F.R. § 230.7(a)(3)). Thus, the issuance of a nationwide permit under § 404 based on a faulty and unsupported minimal impacts analysis violates § 404 of the CWA.
The Corps argued in response to Plaintiffs-Appellants’ permit challenge below and on appeal that its minimal impacts analysis determined that grandfathered authorizations under paragraph (a) would not have more than minimal cumulative effects “by examining the impacts from those authorizations along with the rest of the activities covered by the 2012 NWP 21,” i.e. activities authorized under the new restrictions in paragraph (b). In light of the error discovered on the eve of oral argument, the Corps has now abandoned that argument as justification for its permit decision.
Counsel for the Corps explained at oral argument the basis for the error and how it occurred here. As counsel explained, the original proposal for the reissuance of NWP 21 included only the numerical fill limits imposed in paragraph (b) with no grandfather provision, i.e. paragraph (a). The Corps performed a survey of its districts to estimate potential impacts under NWP 21 based solely on the authorization of new projects under paragraph (b) and came up with 305 activities resulting in 130 acres. After the grandfather provision in paragraph (a) was added late in the regulatory permit process,[3] the Corps went back to estimate the number of potential authorizations under paragraph (a) — estimated as 70 projects — but failed to update its prior estimates on the use of the permit based on the original acreage survey. The *1294 error — described by the Corps in its letter as an underestimation of the total number of acres that may be impacted by NWP 21 — is not merely a math error. The scope of the mistake is much broader. By failing to take into account that individual activities reauthorized under paragraph (a) each could impact more than a half-acre of waters of the United States because they are not subject to paragraph (b)’s numerical fill limits, the Corps failed to consider the actual impact of reauthorizations issued under paragraph (a)’s grandfather provision in its minimal impacts analysis. As a result, all reauthorizations issued under paragraph (a) should be suspended.
The Corps’ own assertions illustrate why the issuance of NWP 21 based on its faulty minimal impacts analysis is arbitrary, capricious, and unlawful. At oral argument, the Corps asserted that the nature of the Corps’ determination of minimal impacts is not reliant on the amount of fill placed in waters of the United States because the determination relies on the individual verification process and the use of compensatory mitigation. The Corps’ argument runs counter to § 404(e) of the CWA and the § 404(b) Guidelines, which require the Corps to consider in its minimal impacts analysis an evaluation of the number of individual discharges of dredged or fill material into waters of the United States expected to be authorized by the general permit until it expires. See 40 C.F.R. § 230.7(b)(3). Yet even reliance on compensatory mitigation as a key component of its minimal impacts analysis demonstrates why the required analysis must take into account the actual acreage impacts. As the Corps explained, the basis for its compensatory mitigation requirement in NWP 21 is to offset impacts to waters by requiring one acre of mitigation for every acre filled.[4] The Corps’ argument is also belied by the very terms of the general permit which imposes the new 1/2-acre and 300 linear foot fill limits as “necessary to ensure that NWP[21] authorizes only those activities that have minimal individual and cumulative adverse effects on the aquatic environment.” As the Corps explained in the Decision Document, “[t]he new acreage and linear foot limits will ensure that this NWP contributes no more than minimal individual and cumulative adverse effects to the aquatic environment, by limiting the amount of waters of the United States that can be filled by each NWP 21 activity.”
In response to Plaintiffs-Appellants’ arguments that the Court should consider its differential treatment argument, the Corps in its supplemental briefing asserts that whether fill activities authorized under paragraph (a) “will have a minimal cumulative impact given the required compensatory mitigation is a question that necessarily turns on the underlying facts regarding the number of projects each paragraph will authorize” and that “the projected impacts under the two paragraphs must be combined and analyzed cumulatively to determine the full impact of the permit.” The Corps describes these factual projec *1295 tions as an integral component of the cumulative impacts analysis. The Corps’ error and subsequent argument illustrate that the minimal impacts analysis was based entirely on the projected impacts of authorizations issued under paragraph (b)’s new fill limitations and failed to account for impacts from projects reauthorized under paragraph (a) that are not subject to any fill limits.
The Corps’ issuance of the permit under these circumstances is the precise type of agency action subject to the Administrative Procedures Act’s (“APA”) arbitrary and capricious standard. See 5 U.S.C.A. § 706(2)(A) (compelling the reviewing court to “hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law”). An agency action is arbitrary and capricious:
where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir.2009) (quoting Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir.2007)). The Corps “entirely failed to consider an important aspect of the problem,” — the impacts of reauthoriza-tions under the grandfather provision in its cumulative impacts analysis. Id. The Corps “offered an explanation for its decision that runs counter to the evidence before the agency” by underestimating— or in reality not individually assessing— the impacts to waters of the United States in its minimal impacts analysis. Id. Agency decisions should be set aside under the APA’s arbitrary and capricious standard “for substantial procedural or substantive reasons as mandated by statute.” N. Buckhead Civic Ass’n v. Skinner, 903 F.2d 1533, 1538-39 (11th Cir.1990) (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). As no actual impact analysis was performed by the Corps prior to its authorization of projects pursuant to the grandfather provision in NWP 21(a), this Court should suspend the 41 reauthorizations issued by the Corps under NWP 21(a) at least until the Corps actually performs the required analysis.[5]
Contrary to the Intervenors’ doomsday assertions, suspension or vacatur of NWP 21 would not result in the halting of all mining operations in the Black Warrior River watershed. NWP 21 is not a mining permit; it is a permit authorizing certain stream filling activities in association with mining operations. Intervenors can operate and conduct stream filling activities associated with their mining operations under the new restrictions in NWP 21(b) or they can seek individual permits under § 404 as contemplated and recognized by the Corps’ Decision Document. The Corps expressly “acknowledge^] that reissuing NWP 21 with a 1/2-acre limit, a *1296 300 linear foot limit for the loss of stream bed, and not authorizing discharges of dredged or fill material into waters of the United States to construct valley fills, will result in more surface coal mining activities requiring Clean Water Act Section 404 individual permits.” Otherwise, allowing projects to proceed pursuant to reau-thorizations issued under paragraph (a) violates the very substance of § 404(e) of the CWA.[6]
At a minimum, the District Court on remand should suspend all authorizations for those projects for which no filling activities have yet to begin. In the proceedings before the district court below, Interve-nors offered specific evidence as to mining operations at only 22 out of the 41 mines authorized under NWP 21(a) in the Black Warrior River watershed. As pointed out in Plaintiffs-Appellants’ underlying briefs and confirmed by counsel for Intervenors at oral argument, a good number of the mines reauthorized under NWP 21(a) are either idle or have not yet begun filling activities in the permitted area. Thus, no viable argument can be made that vacatur would have disruptive effects on mines that are either not operating or have not yet begun filling activities pursuant to their reauthorizations.
For these reasons, I respectfully dissent in part.

. Oral argument on this issue was particularly revealing, more so than the supplemental briefing filed by the Corps, which glossed over the import and magnitude of the error as potentially harmless.

. The Corps’ decision based on this error also violates the National Environmental Policy Act (NEPA) which ”require[s] that agencies take a 'hard look’ at environmental consequences.” Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (internal quotation marks omitted). In determining an agency’s compliance with NEPA, reviewing courts must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.” Balt. Gas & Elec. Co. v. Nat’l Res. Def. Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); see also Robertson, 490 U.S. at 350, 109 S.Ct. 1835. The NEPA regulations require that environmental assessments consider the "environmental impacts of the proposed action and alternatives,” including "cumulative impact.” See 40 C.F.R. §§ 1508.7-1508.9(b). While it is true that the Court may not know the exact scope of the Corps' error, it is crystal clear that the Corps failed to include reauthorized projects in its impacts analysis as required by 40 C.F.R. § 1508.7. The Court therefore has a duty to set aside the Corps’ action when it evades its NEPA obligation to "adequately consider[] and disclose[ ] the environmental impact of its actions.” Balt. Gas & Elec. Co., 462 U.S. at 98, 103 S.Ct. 2246. Because the Corps failed *1293 to comply with the NEPA regulations' requirements, I would vacate the Corps' reau-thorization of NWP 21 as arbitrary and capricious pursuant to 5 U.S.C. § 706(2)(A). See Ala. Envtl. Council v. Adm’r, U.S.E.P.A., 711 F.3d 1277, 1292 (11th Cir.2013) (setting aside Environmental Protection Agency's action because it was not conducted according to the statutory procedures set forth in the Clean Air Act); see also Motor Vehicle Mfrs. Ass’n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.”); Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir.2009) discussed infra.

. The Corps did not include the grandfather provision until after a December 2011 meeting between the Office of Management and Budget and the National Mining Association, after the public comment period on NWP 21 had closed in April 2011.

. The efficacy of mitigation, however, is not based solely on consideration of the number of acres impacted by permitted activities. The 2008 Compensatory Mitigation Rule, in effect since June 9, 2008, provides that for impacts authorized under § 404, compensatory mitigation is not considered until after all appropriate and practicable steps have been taken to first avoid and then minimize adverse impacts to the aquatic ecosystem pursuant to the CWA § 404(b) Guidelines. 43 Fed. Reg. 19,594; see 40 C.F.R. §§ 230.91 et seq. "The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by [Army Corps] permits.” 40 C.F.R. § 230.93(a)(1). The determination of the necessary compensatory mitigation is based on a host of different factors. See 40 C.F.R. § 230.93.

. The Corps’ request for remand to the agency without vacatur so that it can perform the analysis that was required of it prior to the issuance of the general permit presents "a cart before the horse” problem. In its issuance of NWP 21, the Corps assumed there were no more than minimal cumulative or individual impacts without consideration of an essential component of the data analysis, and now argues we should presume no environmental harm after nearly three years of authorized filling activities allowed by dint of the agency's clear error.

. It is noteworthy that many of the cases from the United States Court of Appeals for the District of Columbia Circuit (involving environmental administrative challenges) that decline to grant vacatur after engaging in a balancing of the equities arise in contexts where the agency's enforcement of environmental protections pending remand is consistent with the statutory goals at issue as opposed to the circumstances presented in this case where filling activities will be allowed to continue. See North Carolina v. EPA, 550 F.3d 1176, 1177-78 (D.C.Cir.2008); Ne. Md. Waste Disposal Auth. v. EPA, 358 F.3d 936, 939 (D.C.Cir.2004).